# FIRST NATIONAL BANK OF BOSTON et al. v. BELLOTTI, ATTORNEY GENERAL OF MASSACHUSETTS

No. 76–1172. Argued November 9, 1977—Decided April 26, 1978

766

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, and Stevens, JJ., joined. Burger, C. J., filed a concurring opinion, post, p. 795. White, J., filed a dissenting opinion, in

which BRENNAN and MARSHALL, JJ., joined, *post*, p. 802. REHNQUIST, J., filed a dissenting opinion, *post*, p. 822.

*Francis H. Fox* argued the cause for appellants. With him on the briefs was *E. Susan Garsh.*

*Thomas R. Kiley*, Assistant Attorney General of Massachusetts, argued the cause for appellee. With him on the brief were *Francis X. Bellotti*, Attorney General, *pro se*, and *Stephen Schultz*, Assistant Attorney General.*

MR. JUSTICE POWELL delivered the opinion of the Court.

In sustaining a state criminal statute that forbids certain expenditures by banks and business corporations for the purpose of influencing the vote on referendum proposals, the Massachusetts Supreme Judicial Court held that the First Amendment rights of a corporation are limited to issues that materially affect its business, property, or assets. The court rejected appellants' claim that the statute abridges freedom of speech in violation of the First and Fourteenth Amendments. The issue presented in this context is one of first impression in this Court. We postponed the question of jurisdiction to our consideration of the merits. 430 U. S. 964 (1977). We now reverse.

## I

The statute at issue, Mass. Gen. Laws Ann., ch. 55, § 8 (West Supp. 1977), prohibits appellants, two national banking

---

*Briefs of *amici curiae* urging reversal were filed by *Henry Paul Monaghan* for the Associated Industries of Massachusetts, Inc., et al., and by *Jerome H. Torshen, Jeffrey Cole, Stanley T. Kaleczyc, Jr.*, and *Lawrence B. Kraus* for the Chamber of Commerce of the United States.

*William C. Oldaker* filed a brief for the Federal Election Commission as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Mike Greely*, Attorney General, and *Jack Lowe*, Special Assistant Attorney General, for the State of Montana; by *James S. Hostetler* for the New England Council; and by *Ronald A. Zumbrun, Robert K. Best, John H. Findley, Albert Ferri, Jr.*, and *W. Hugh O'Riordan* for the Pacific Legal Foundation.

associations and three business corporations,[1] from making contributions or expenditures "for the purpose of . . . influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation." The statute further specifies that "[n]o question submitted to the voters solely concerning the taxation of the income, property or transactions of individuals shall be deemed materially to affect the property, business or assets of the corporation." A corporation that violates § 8 may receive a maximum fine of $50,000; a corporate officer, director, or agent who violates the section may receive a maximum fine of $10,000 or imprisonment for up to one year, or both.[2]

---

[1] Appellants are the First National Bank of Boston, New England Merchants National Bank, the Gillette Co., Digital Equipment Corp., and Wyman-Gordon Co.

[2] Massachusetts Gen. Laws Ann., ch. 55, § 8 (West Supp. 1977), provides (with emphasis supplied):

*"No corporation carrying on the business of a bank,* trust, surety, indemnity, safe deposit, insurance, railroad, street railway, telegraph, telephone, gas, electric light, heat, power, canal, aqueduct, or water company, no company having the right to take land by eminent domain or to exercise franchises in public ways, granted by the commonwealth or by any county, city or town, no trustee or trustees owning or holding the majority of the stock of such a corporation, *no business corporation incorporated under the laws of or doing business in the commonwealth* and no officer or agent acting in behalf of any corporation mentioned in this section, *shall directly or indirectly give, pay, expend or contribute,* or promise to give, pay, expend or contribute, *any money or other valuable thing for the purpose of* aiding, promoting or preventing the nomination or election of any person to public office, or aiding, promoting or antagonizing the interests of any political party, or *influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation. No question submitted to the voters solely concerning the taxation of the income, property or transactions of individuals shall be deemed materially to affect the property, business or assets of the corporation.* No person or persons, no political committee, and no person acting under the authority of a political com-

Appellants wanted to spend money to publicize their views on a proposed constitutional amendment that was to be submitted to the voters as a ballot question at a general election on November 2, 1976. The amendment would have permitted the legislature to impose a graduated tax on the income of individuals. After appellee, the Attorney General of Massachusetts, informed appellants that he intended to enforce § 8 against them, they brought this action seeking to have the statute declared unconstitutional. On April 26, 1976, the case was submitted to a single justice of the Supreme Judicial Court on an expedited basis and upon agreed facts, in order to settle the question before the upcoming election.[3] Judgment was reserved and the case referred to the full court that same day.

mittee, or in its behalf, shall solicit or receive from such corporation or such holders of stock any gift, payment, expenditure, contribution or promise to give, pay, expend or contribute for any such purpose.

"Any corporation violating any provision of this section shall be punished by a fine of not more than fifty thousand dollars and any officer, director or agent of the corporation violating any provision thereof or authorizing such violation, . . . shall be punished by a fine of not more than ten thousand dollars or by imprisonment for not more than one year, or both."

[3] This was not the first challenge to § 8. The statute's legislative and judicial history has been a troubled one. Its successive re-enactments have been linked to the legislature's repeated submissions to the voters of a constitutional amendment that would allow the enactment of a graduated tax.

The predecessor of § 8, Mass. Gen. Laws, ch. 55, § 7 (as amended by 1946 Mass. Acts, ch. 537, § 10), was first challenged in *Lustwerk* v. *Lytron, Inc.*, 344 Mass. 647, 183 N. E. 2d 871 (1962). Unlike § 8, § 7 did not dictate that questions concerning the taxation of individuals could not satisfy the "materially affecting" requirement. The Supreme Judicial Court construed § 7 not to prohibit a corporate expenditure urging the voters to reject a proposed constitutional amendment authorizing the legislature to impose a graduated tax on corporate as well as individual income.

After *Lustwerk* the legislature amended § 7 by adding the sentence: "No question submitted to the voters concerning the taxation of the income, property or transactions of individuals shall be deemed materially

Appellants argued that § 8 violates the First Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and similar provisions of the Massachusetts Constitution. They prayed that the statute be declared unconstitutional on its face and as it would be applied to their proposed expenditures. The parties' statement of agreed facts reflected their disagreement as to the effect that the adoption of a personal income tax would have on appellants' business; it noted that "[t]here is a division of opinion among economists as to whether and to what extent a graduated income tax imposed solely on individuals would affect the business and assets of corporations." App. 17. Appellee did not dispute that appellants' management believed that the tax would have a significant effect on their businesses.[4]

---

to affect the property, business or assets of the corporation." 1972 Mass. Acts, ch. 458. The statute was challenged in 1972 by four of the present appellants; they wanted to oppose a referendum proposal similar to the one submitted to and rejected by the voters in 1962. Again the expenditure was held to be lawful. *First Nat. Bank of Boston* v. *Attorney General*, 362 Mass. 570, 290 N. E. 2d 526 (1972).

The most recent amendment was enacted on April 28, 1975, when the legislature further refined the second sentence of § 8 to apply only to ballot questions "solely" concerning the taxation of individuals. 1975 Mass. Acts, ch. 151, § 1. Following this amendment, the legislature on May 7, 1975, voted to submit to the voters on November 2, 1976, the proposed constitutional amendment authorizing the imposition of a graduated *personal* income tax. It was this proposal that led to the case now before us.

[4] Appellants believe that the adoption of a graduated personal income tax would materially affect their business in a variety of ways, including, in the words of the court below,

"discouraging highly qualified executives and highly skilled professional personnel from settling, working or remaining in Massachusetts; promoting a tax climate which would be considered unfavorable by business corporations, thereby discouraging them from settling in Massachusetts with 'resultant adverse effects' on the plaintiff banks' loans, deposits, and other services; and tending to shrink the disposable income of individuals avail-

On September 22, 1976, the full bench directed the single justice to enter judgment upholding the constitutionality of § 8. An opinion followed on February 1, 1977. In addressing appellants' constitutional contentions,[5] the court acknowledged that § 8 "operate[s] in an area of the most fundamental First Amendment activities," *Buckley* v. *Valeo,* 424 U. S. 1, 14 (1976), and viewed the principal question as "whether business corporations, such as [appellants], have First Amendment rights coextensive with those of natural persons or associations of natural persons." 371 Mass. 773, 783, 359 N. E. 2d 1262, 1269. The court found its answer in the contours of a corporation's constitutional right, as a "person" under the Fourteenth Amendment, not to be deprived of property without due process of law. Distinguishing the First Amendment rights of a natural person from the more limited rights of a corporation, the court concluded that "whether its rights are designated 'liberty' rights or 'property' rights, a corporation's property and business interests are entitled to Fourteenth Amendment protection. . . . [A]s an incident of such protection, corporations also possess certain rights of speech and expression under the First Amendment." *Id.,* at 784, 359 N. E. 2d, at 1270 (citations and footnote omitted). Accordingly, the court held that "only when a general political issue materially affects a corporation's business, property or assets may that corporation claim First Amendment protection for its speech or other

---

able for the purchase of the consumer products manufactured by at least one of the plaintiff corporations." 371 Mass., at 777, 359 N. E. 2d, at 1266.

[5] In contrast to its approach in the previous challenges to the predecessor of § 8, see n. 3, *supra,* the court determined that it had to address appellants' constitutional challenge because "[t]he statutory amendment to § 8 makes it clear that the Legislature has specifically proscribed corporate expenditures of moneys relative to this proposed amendment." 371 Mass., at 780, 359 N. E. 2d, at 1268. This was clear from the language of the second sentence of § 8 and from the legislature's synchronized amendment of § 8 and approval of the submission of the ballot question to the voters.

activities entitling it to communicate its position on that issue to the general public." Since this limitation is "identical to the legislative command in the first sentence of [§ 8]," the court concluded that the legislature "has clearly identified in the challenged statute the parameters of corporate free speech." *Id.*, at 785, 359 N. E. 2d, at 1270.

The court also declined to say that there was "no rational basis for [the] legislative determination," embodied in the second sentence of § 8, that a ballot question concerning the taxation of individuals could not materially affect the interests of a corporation. *Id.*, at 786, 359 N. E. 2d, at 1271. In rejecting appellants' argument that this second sentence established a conclusive presumption in violation of the Due Process Clause, the court construed § 8 to embody two distinct crimes: The first prohibits a corporation from spending money to influence the vote on a ballot question not materially affecting its business interests; the second, and more specific, prohibition makes it criminal *per se* for a corporation to spend money to influence the vote on a ballot question solely concerning individual taxation. While acknowledging that the second crime is "related to the general crime" stated in the first sentence of § 8, the court intimated that the second sentence was intended to make criminal an expenditure of the type proposed by appellants without regard to specific proof of the materiality of the question to the corporation's business interests.[6] *Id.*, at 795 n. 19, 790–791, 359 N. E. 2d, at 1276 n. 19,

---

[6] For purposes of this decision we need not distinguish between the "two crimes" identified by the Supreme Judicial Court. MR. JUSTICE WHITE, dissenting, conveys an incorrect impression of our decision when he states, *post*, at 803, that we have not disapproved the legislative judgment that the personal income tax issue could not have a material effect on any corporation, including appellants. We simply have no occasion either to approve or to disapprove that judgment. If we were to invalidate the second sentence of § 8, thereby putting a ballot question concerning taxation of individuals on the same plane as any other ballot question, we still would have to decide whether the "materially affecting" limitation in the general

1273–1274. The court nevertheless seems to have reintroduced the "materially affecting" concept into its interpretation of the second sentence of § 8, as a limitation on the scope of the so-called "second crime" imposed by the Federal Constitution rather than the Massachusetts Legislature. *Id.*, at 786, 359 N. E. 2d, at 1271. But because the court thought appellants had not made a sufficient showing of material effect, their challenge to the statutory prohibition as applied to them also failed.

Appellants' other arguments fared no better. Adopting a narrowing construction of the statute,[7] the Supreme Judicial Court rejected the contention that § 8 is overbroad. It also found no merit in appellants' vagueness argument because the specific prohibition against corporate expenditures on a referendum solely concerning individual taxation is "both precise and definite." *Id.*, at 791, 359 N. E. 2d, at 1273–1274.

---

prohibition of § 8 could be squared with the First Amendment. The court below already has held that appellants' proposed expenditures would not meet that test and therefore would be proscribed. This is a finding of fact which we have no occasion to review. But cf. n. 21, *infra*.

Conversely, we would have to reach the question of the constitutionality of the "second" and more restrictive crime only if we first concluded that it is permissible under the First Amendment to limit corporate speech to matters materially affecting the corporation's business, property, or assets Because the "materially affecting" limitation bars appellants from making their proposed expenditures under either the first or second sentence of § 8, we must decide whether that limitation is constitutional.

[7] The court stated that § 8 would not prohibit the publication of "in-house" newspapers or communications to stockholders containing the corporation's view on a graduated personal income tax; the participation by corporate employees, at corporate expense, in discussions or legislative hearings on the issue; the participation of corporate officers, directors, stockholders, or employees in public discussion of the issue on radio or television, at news conferences, or through statements to the press or "similar means not involving contributions or expenditure of corporate funds"; or speeches or comments by employees or officers, on working hours, to the press or a chamber of commerce. 371 Mass., at 789, 359 N. E. 2d, at 1272.

Finally, the court held that appellants were not denied the equal protection of the laws.[8]

## II

Because the 1976 referendum has been held, and the proposed constitutional amendment defeated, we face at the outset a question of mootness. As the case falls within the class of controversies "capable of repetition, yet evading review," *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911), we conclude that it is not moot. Present here are both elements identified in *Weinstein* v. *Bradford,* 423 U. S. 147, 149 (1975), as precluding a finding of mootness in the absence of a class action: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."

Under no reasonably foreseeable circumstances could appellants obtain plenary review by this Court of the issue here presented in advance of a referendum on a similar constitutional amendment. In each of the legislature's four attempts to obtain constitutional authorization to enact a graduated income tax, including this most recent one, the period of time between legislative authorization of the proposal and its submission to the voters was approximately 18 months. This proved too short a period of time for appellants to obtain complete judicial review, and there is every reason to believe that any future suit would take at least as long. Furthermore, a decision allowing the desired expenditures would be an empty gesture unless it afforded appellants sufficient opportunity prior to the election date to communicate their views effectively.

Nor can there be any serious doubt that there is a "reasonable expectation," *Weinstein* v. *Bradford, supra,* that appel-

---

[8] Because of our disposition of appellants' First Amendment claim, we need not address any of these arguments.

lants again will be subject to the threat of prosecution under § 8. The 1976 election marked the fourth time in recent years that a proposed graduated income tax amendment has been submitted to the Massachusetts voters. Appellee's suggestion that the legislature may abandon its quest for a constitutional amendment is purely speculative.[9] Appellants insist that they will continue to oppose the constitutional amendment, and there is no reason to believe that the Attorney General will refrain from prosecuting violations of § 8.[10] Compare *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539, 546–547 (1976), with *Spomer* v. *Littleton*, 414 U. S. 514, 521 (1974).

Meanwhile, § 8 remains on the books as a complete prohibition of corporate expenditures related to individual tax referenda, and as a restraining influence on corporate expenditures concerning other ballot questions. The criminal penalties of § 8 discourage challenge by violation, and the effect of the statute on arguably protected speech will persist. *Storer* v. *Brown*, 415 U. S. 724, 737 n. 8 (1974); see *American Party of Texas* v. *White*, 415 U. S. 767, 770 n. 1 (1974); *Rosario* v. *Rockefeller*, 410 U. S. 752, 756 n. 5 (1973); *Dunn* v. *Blumstein*, 405 U. S. 330, 333 n. 2 (1972). Accordingly, we conclude that this case is not moot and proceed to address the merits.

### III

The court below framed the principal question in this case as whether and to what extent corporations have First Amend-

---

[9] Most of the States, and the District of Columbia, impose graduated personal income taxes. U. S. Dept. of Commerce, Bureau of the Census, State Government Tax Collections in 1977, Table 9, p. 13 (1977). Several States impose a graduated tax on corporate income. Advisory Commission on Intergovernmental Relations, Significant Features of Fiscal Federalism, Vol. II, Table 113, pp. 219–222 (1977).

[10] We are informed that the Attorney General also has threatened one of the appellants with prosecution under § 8 for an expenditure in support of a local referendum proposal concerning a civic center. Brief for Appellants 22 n. 7, A–1.

ment rights. We believe that the court posed the wrong question. The Constitution often protects interests broader than those of the party seeking their vindication. The First Amendment, in particular, serves significant societal interests. The proper question therefore is not whether corporations "have" First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether § 8 abridges expression that the First Amendment was meant to protect. We hold that it does.

## A

The speech proposed by appellants is at the heart of the First Amendment's protection.

"The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102 (1940).

The referendum issue that appellants wish to address falls squarely within this description. In appellants' view, the enactment of a graduated personal income tax, as proposed to be authorized by constitutional amendment, would have a seriously adverse effect on the economy of the State. See n. 4, *supra.* The importance of the referendum issue to the people and government of Massachusetts is not disputed. Its merits, however, are the subject of sharp disagreement.

As the Court said in *Mills* v. *Alabama,* 384 U. S. 214, 218 (1966), "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free

discussion of governmental affairs." If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to decisionmaking in a democracy,[11] and this is no less true because the speech comes from a corporation rather than an individual.[12] The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.

The court below nevertheless held that corporate speech is protected by the First Amendment only when it pertains directly to the corporation's business interests. In deciding whether this novel and restrictive gloss on the First Amendment comports with the Constitution and the precedents of this Court, we need not survey the outer boundaries of the Amendment's protection of corporate speech, or address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment.[13]

---

[11] Freedom of expression has particular significance with respect to government because "[i]t is here that the state has a special incentive to repress opposition and often wields a more effective power of suppression." T. Emerson, Toward a General Theory of the First Amendment 9 (1966). See also A. Meiklejohn, Free Speech and Its Relation to Self-Government 24–26 (1948).

[12] The individual's interest in self-expression is a concern of the First Amendment separate from the concern for open and informed discussion, although the two often converge. See G. Gunther, Cases and Materials on Constitutional Law 1044 (9th ed. 1975); T. Emerson, The System of Freedom of Expression 6 (1970). The Court has declared, however, that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964). And self-govenment suffers when those in power suppress competing views on public issues "from diverse and antagonistic sources." *Associated Press* v. *United States*, 326 U. S. 1, 20 (1945), quoted in *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 266 (1964).

[13] Nor is there any occasion to consider in this case whether, under different circumstances, a justification for a restriction on speech that would

The question in this case, simply put, is whether the corporate identity of the speaker deprives this proposed speech of what otherwise would be its clear entitlement to protection. We turn now to that question.

B

The court below found confirmation of the legislature's definition of the scope of a corporation's First Amendment rights in the language of the Fourteenth Amendment. Noting that the First Amendment is applicable to the States through the Fourteenth, and seizing upon the observation that corporations "cannot claim for themselves the liberty which the Fourteenth Amendment guarantees," *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925), the court concluded that a corporation's First Amendment rights must derive from its property rights under the Fourteenth.[14]

be inadequate as applied to individuals might suffice to sustain the same restriction as applied to corporations, unions, or like entities.

[14] The Massachusetts court did not go so far as to accept appellee's argument that corporations, as creatures of the State, have only those rights granted them by the State. See Brief for Appellee 4, 23–25. Cf. MR. JUSTICE WHITE's dissent, *post,* at 809; MR. JUSTICE REHNQUIST's dissent, *post,* p. 822. The court below recognized that such an extreme position could not be reconciled either with the many decisions holding state laws invalid under the Fourteenth Amendment when they infringe protected speech by corporate bodies, *e. g., Linmark Associates, Inc.* v. *Township of Willingboro,* 431 U. S. 85 (1977); *Time, Inc.* v. *Firestone,* 424 U. S. 448 (1976); *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922 (1975); *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546 (1975); *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974); *New York Times Co.* v. *United States,* 403 U. S. 713 (1971); *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967); *New York Times Co.* v. *Sullivan, supra; Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S. 684 (1959); *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495 (1952), or with decisions affording corporations the protection of constitutional guarantees other than the First Amendment. *E. g., United States* v. *Martin Linen Supply Co.,* 430 U. S. 564 (1977) (Fifth Amendment double jeopardy); *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 353 (1977) (Fourth Amendment). In any event, appellee's argument is inapplicable to two of the appellants. National banks are creatures of federal law and in-

This is an artificial mode of analysis, untenable under decisions of this Court.

> "In a series of decisions beginning with *Gitlow* v. *New York*, 268 U. S. 652 (1925), this Court held that the liberty of speech and of the press which the First Amendment guarantees against abridgment by the federal government is within the *liberty* safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action. That principle has been followed and reaffirmed to the present day." *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 500-501 (1952) (footnote omitted) (emphasis supplied).

---

strumentalities of the Federal Government, *Easton* v. *Iowa,* 188 U. S. 220, 229-230 (1903); *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), and their existence is in no way dependent on state law. See 7A Michie, Banks and Banking, ch. 15, §§ 1, 5 (1973 ed.).

In cases where corporate speech has been denied the shelter of the First Amendment, there is no suggestion that the reason was because a corporation rather than an individual or association was involved. *E. g., Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976); *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376 (1973); *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436 (1957). Corporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as the privilege against compulsory self-incrimination, *Wilson* v. *United States,* 221 U. S. 361, 382-386 (1911), or equality with individuals in the enjoyment of a right to privacy, *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 65-67 (1974); *United States* v. *Morton Salt Co.,* 338 U. S. 632, 651-652 (1950), but this is not because the States are free to define the rights of their creatures without constitutional limit. Otherwise, corporations could be denied the protection of all constitutional guarantees, including due process and the equal protection of the laws. Certain "purely personal" guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the "historic function" of the particular guarantee has been limited to the protection of individuals. *United States* v. *White,* 322 U. S. 694, 698-701 (1944). Whether or not a particular guarantee is "purely personal" or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision.

Freedom of speech and the other freedoms encompassed by the First Amendment always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause, see *Gitlow* v. *New York,* 268 U. S. 652, 666 (1925) (opinion of the Court); *id.,* at 672 (Holmes, J., dissenting); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958); *Stromberg* v. *California,* 283 U. S. 359, 368 (1931); *De Jonge* v. *Oregon,* 299 U. S. 353, 364 (1937); Warren, The New "Liberty" Under the Fourteenth Amendment, 39 Harv. L. Rev. 431 (1926), and the Court has not identified a separate source for the right when it has been asserted by corporations.[15] See, *e. g., Times Film Corp.* v. *Chicago,* 365 U. S. 43, 47 (1961); *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S. 684, 688 (1959); *Joseph Burstyn, supra.* In *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244 (1936), the Court rejected the very reasoning adopted by the Supreme Judicial Court and did not rely on the corporation's property rights under the Fourteenth Amendment in sustaining its freedom of speech.[16]

---

[15] It has been settled for almost a century that corporations are persons within the meaning of the Fourteenth Amendment. *Santa Clara County* v. *Southern Pacific R. Co.,* 118 U. S. 394 (1886); see *Covington & Lexington Turnpike R. Co.* v. *Sandford,* 164 U. S. 578 (1896).

[16] The appellant in *Grosjean* argued that "[t]he liberty guaranteed by the fourteenth amendment against deprivation without due process of law is the liberty of NATURAL not of artificial persons." Brief for Appellant in *Grosjean* v. *American Press Co.,* O. T. 1935, No. 303, p. 42; see 297 U. S., at 235. See also *Hague* v. *CIO,* 307 U. S. 496, 518 (1939) (opinion of Stone, J.). But see *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449 (1958); *NAACP* v. *Button,* 371 U. S. 415 (1963).

The semantic reasoning of the court below would lead logically to the conclusion that the protection afforded speech by corporations, or, for that matter, other artificial entities and associations, would differ depending on whether the source of the alleged abridgment was a State or the Federal Government. But the States do not have greater latitude than Congress to abridge freedom of speech. The dissenting opinion of MR. JUSTICE REHNQUIST, *post,* at 823, is predicated on the view that the First Amend-

Yet appellee suggests that First Amendment rights generally have been afforded only to corporations engaged in the communications business or through which individuals express themselves, and the court below apparently accepted the "materially affecting" theory as the conceptual common denominator between appellee's position and the precedents of this Court. It is true that the "materially affecting" requirement would have been satisfied in the Court's decisions affording protection to the speech of media corporations and corporations otherwise in the business of communication or entertainment, and to the commercial speech of business corporations. See cases cited in n. 14, *supra*. In such cases, the speech would be connected to the corporation's business almost by definition. But the effect on the business of the corporation was not the governing rationale in any of these decisions. None of them mentions, let alone attributes significance to, the fact that the subject of the challenged communication materially affected the corporation's business.

The press cases emphasize the special and constitutionally recognized role of that institution in informing and educating the public, offering criticism, and providing a forum for discussion and debate.[17] *Mills* v. *Alabama*, 384 U. S., at 219; see

_____

ment has only a "limited application . . . to the States." See also *Buckley* v. *Valeo*, 424 U. S. 1, 291–292 (1976) (opinion of REHNQUIST, J.). Although advanced forcefully by Mr. Justice Jackson in 1952, *Beauharnais* v. *Illinois*, 343 U. S. 250, 287–295 (1952) (dissenting opinion), and repeated by Mr. Justice Harlan in 1957, *Roth* v. *United States*, 354 U. S. 476, 500–503 (1957) (dissenting opinion), this view has never been accepted by any majority of this Court.

[17] By its terms, § 8 would seem to apply to corporate members of the press. The court below noted, however, that no one "has . . . asserted that [§ 8] bars the press, corporate, institutional or otherwise, from engaging in discussion or debate on the referendum question." 371 Mass., at 785 n. 13, 359 N. E. 2d, at 1270 n. 13. Because none of the appellants claimed to be part of the institutional press, the court did not "venture an opinion on such matters." *Ibid.*

The observation of MR. JUSTICE WHITE, *post*, at 808 n. 8, that media

*Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 863–864 (1974) (POWELL, J., dissenting). But the press does not have a monopoly on either the First Amendment or the ability to enlighten.[18] Cf. *Buckley* v. *Valeo*, 424 U. S., at 51 n. 56;

corporations cannot be "immunize[d]" from restrictions on electoral expenditures, ignores the fact that those corporations need not make separately identifiable expenditures to communicate their views. They accomplish the same objective each day within the framework of their usual protected communications.

[18] If we were to adopt appellee's suggestion that communication by corporate members of the institutional press is entitled to greater constitutional protection than the same communication by appellants, the result would not be responsive to the informational purpose of the First Amendment. Certainly there are voters in Massachusetts, concerned with such economic issues as the tax rate, employment opportunities, and the ability to attract new business into the State and to prevent established businesses from leaving, who would be as interested in hearing appellants' views on a graduated tax as the views of media corporations that might be less knowledgeable on the subject. "[P]ublic debate must not only be unfettered; it must also be informed." *Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 862–863 (1974) (POWELL, J., dissenting).

MR. JUSTICE WHITE's dissenting view would empower a State to restrict corporate speech far more narrowly than would the opinion of the Massachusetts court or the statute under consideration. This case involves speech in connection with a referendum. MR. JUSTICE WHITE's rationale would allow a State to proscribe the expenditure of corporate funds at any time for the purpose of expressing views on "political [or] social questions" or in connection with undefined "ideological crusades," unless the expenditures were shown to be "integrally related to corporate business operations." *Post*, at 803, 805, 806, 816, 819, 821. Thus corporate activities that are widely viewed as educational and socially constructive could be prohibited. Corporations no longer would be able safely to support—by contributions or public service advertising—educational, charitable, cultural, or even human rights causes. Similarly, informational advertising on such subjects of national interest as inflation and the worldwide energy problem could be prohibited. Many of these "causes" and subjects could be viewed as "social," "political," or "ideological." No prudent corporate management would incur the risk of criminal penalties, such as those in the Massachusetts Act, that would follow from a failure to prove the materiality to the corporation's "business, property or assets" of such contributions or advertisements. See n. 21, *infra*.

*Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 389–390 (1969); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 266 (1964); *Associated Press* v. *United States*, 326 U. S. 1, 20 (1945). Similarly, the Court's decisions involving corporations in the business of communication or entertainment are based not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas.[19] See *Red Lion Broadcasting Co.* v. *FCC, supra; Stanley* v. *Georgia*, 394 U. S. 557, 564 (1969); *Time, Inc.* v. *Hill*, 385 U. S. 374, 389 (1967). Even decisions seemingly based exclusively on the individual's right to express himself acknowledge that the expression may contribute to society's edification. *Winters* v. *New York*, 333 U. S. 507, 510 (1948).

Nor do our recent commercial speech cases lend support to appellee's business interest theory. They illustrate that the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw. A commercial advertisement is constitutionally protected not so much because it pertains to the seller's business as because it furthers the societal interest in the "free flow of commercial information." *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council*, 425 U. S. 748, 764 (1976); see *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 95 (1977).[20]

---

[19] The suggestion in MR. JUSTICE WHITE's dissent, *post*, at 807, that the First Amendment affords less protection to ideas that are not the product of "individual choice" would seem to apply to newspaper editorials and every other form of speech created under the auspices of a corporate body. No decision of this Court lends support to such a restrictive notion.

[20] It is somewhat ironic that appellee seeks to reconcile these decisions with the "materially affecting" concept by noting that the commercial speaker would "have a direct financial interest in the speech," Brief for Appellee 19, and n. 12. Until recently, the "purely commercial" nature

## C

We thus find no support in the First or Fourteenth Amendment, or in the decisions of this Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation that cannot prove, to the satisfaction of a court, a material effect on its business or property. The "materially affecting" requirement is not an identification of the boundaries of corporate speech etched by the Constitution itself. Rather, it amounts to an impermissible legislative prohibition of speech based on the identity of the interests that spokesmen may represent in public debate over controversial issues and a requirement that the speaker have a sufficiently great interest in the subject to justify communication.

Section 8 permits a corporation to communicate to the public its views on certain referendum subjects—those materially affecting its business—but not others. It also singles out one kind of ballot question—individual taxation—as a subject about which corporations may never make their ideas public. The legislature has drawn the line between permissible and impermissible speech according to whether there is a sufficient nexus, as defined by the legislature, between the issue presented to the voters and the business interests of the speaker.

In the realm of protected speech, the legislature is consti-

---

of an advertisement was thought to undermine and even negate its entitlement to the sanctuary of the First Amendment. *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942); see *Bigelow* v. *Virginia,* 421 U. S. 809, 822 (1975); *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976). Appellee would invert the debate by giving constitutional significance to a corporation's "hawking of wares" while approving criminal sanctions for a bank's expression of opinion on a tax law of general public interest.

In emphasizing the societal interest and the fact that this Court's decisions have not turned on the effect upon the speaker's business interests, we do not say that such interests may not be relevant or important in a different context.

tutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue. *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972). If a legislature may direct business corporations to "stick to business," it also may limit other corporations—religious, charitable, or civic—to their respective "business" when addressing the public. Such power in government to channel the expression of views is unacceptable under the First Amendment.[21] Especially where, as here, the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people,[22] the First Amendment is

---

[21] Even assuming that the rationale behind the "materially affecting" requirement itself were unobjectionable, the limitation in § 8 would have an impermissibly restraining effect on protected speech. Much valuable information which a corporation might be able to provide would remain unpublished because corporate management would not be willing to risk the substantial criminal penalties—personal as well as corporate—provided for in § 8. *New York Times Co.* v. *Sullivan,* 376 U. S., at 279; *Smith* v. *California,* 361 U. S. 147, 151 (1959); *Speiser* v. *Randall,* 357 U. S. 513, 526 (1958). As the facts in this case illustrate, management never could be sure whether a court would disagree with its judgment as to the effect upon the corporation's business of a particular referendum issue. In addition, the burden and expense of litigating the issue—especially when what must be established is a complex and amorphous economic relationship—would unduly impinge on the exercise of the constitutional right. "[T]he free dissemination of ideas [might] be the loser." *Smith* v. *California, supra,* at 151; see *Freedman* v. *Maryland,* 380 U. S. 51, 59–60 (1965).

[22] Cf. *Madison School Dist.* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 175–176 (1976).

Our observation about the apparent purpose of the Massachusetts Legislature is not an endorsement of the legislature's factual assumptions about the views of corporations. We know of no documentation of the notion that corporations are likely to share a monolithic view on an issue such as the adoption of a graduated personal income tax. Corporations, like individuals or groups, are not homogeneous. They range from great multinational enterprises whose stock is publicly held and traded to medium-size

plainly offended. Yet the State contends that its action is necessitated by governmental interests of the highest order. We next consider these asserted interests.

## IV

The constitutionality of § 8's prohibition of the "exposition of ideas" by corporations turns on whether it can survive the exacting scrutiny necessitated by a state-imposed restriction of freedom of speech. Especially where, as here, a prohibition is directed at speech itself,[23] and the speech is intimately related to the process of governing, "the State may prevail only upon showing a subordinating interest which is compelling," *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960); see *NAACP* v. *Button,* 371 U. S. 415, 438–439 (1963); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S., at 463; *Thomas* v. *Collins,* 323 U. S. 516, 530 (1945), "and the burden is on the government to show the existence of such an interest." *Elrod* v. *Burns,* 427 U. S. 347, 362 (1976). Even then, the State must employ means "closely drawn to avoid unnecessary abridgment . . . ." *Buckley* v. *Valeo,* 424 U. S., at 25; see *NAACP* v. *Button, supra,* at 438; *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960).

The Supreme Judicial Court did not subject § 8 to "the critical scrutiny demanded under accepted First Amendment

public companies and to those that are closely held and controlled by an individual or family. It is arguable that small or medium-size corporations might welcome imposition of a graduated personal income tax that might shift a greater share of the tax burden onto wealthy individuals. See Brief for New England Council as *Amicus Curiae* 23–24.

[23] It is too late to suggest "that the dependence of a communication on the expenditure of money itself operates to introduce a nonspeech element or to reduce the exacting scrutiny required by the First. Amendment." *Buckley* v. *Valeo,* 424 U. S., at 16; see *New York Times Co.* v. *Sullivan,* 376 U. S., at 266. Furthermore, § 8 is an "attempt directly to control speech . . . rather [than] to protect, from an evil shown to be grave, some interest clearly within the sphere of governmental concern." *Speiser* v. *Randall,* 357 U. S., at 527. Cf. *United States* v. *O'Brien,* 391 U. S. 367 (1968).

and equal protection principles," *Buckley, supra,* at 11, because of its view that the First Amendment does not apply to appellants' proposed speech.[24] For this reason the court did not even discuss the State's interests in considering appellants' First Amendment argument. The court adverted to the conceivable interests served by § 8 only in rejecting appellants' equal protection claim.[25] Appellee nevertheless advances two principal justifications for the prohibition of corporate speech. The first is the State's interest in sustaining the active role of the individual citizen in the electoral process and thereby preventing diminution of the citizen's confidence in government. The second is the interest in protecting the rights of shareholders whose views differ from those expressed by management on behalf of the corporation. However weighty these interests may be in the context of partisan candidate elec-

---

[24] The court justified its deferential standard of review more explicitly in its discussion of appellants' equal protection claim:

"We think that the appropriate standard of review on this issue is not the strict scrutiny that the plaintiffs suggest is apposite but, rather, is the traditional scrutiny involving economic matters. While we agree with the plaintiffs that where free speech is involved strict scrutiny is required . . . , we have already concluded that the plaintiffs do not possess First Amendment rights on matters not shown to affect materially their business, property or assets." 371 Mass., at 793, 359 N. E. 2d, at 1275 (citations omitted).

[25] The court reasoned that the inclusion of business corporations in § 8, but not entities such as unincorporated associations, partnerships, labor unions, or nonprofit corporations, *might* be attributable to the fact that the latter entities do not have shareholders: "Section 8 could represent a legislative desire to protect such shareholders against ultra vires activities . . . ." *Id.,* at 794, 359 N. E. 2d, at 1275. The court found justification for the noninclusion of other entities that have shareholders, such as business trusts and real estate investment trusts, in the supposition that "the Legislature may justifiably have concluded that such trusts did not present the type of problem in this area presented by general business corporations." *Ibid.* The court did not specify which "type of problem" it meant.

tions,[26] they either are not implicated in this case or are not served at all, or in other than a random manner, by the prohibition in § 8.

A

Preserving the integrity of the electoral process, preventing corruption, and "sustain[ing] the active, alert responsibility

[26] In addition to prohibiting corporate contributions and expenditures for the purpose of influencing the vote on a ballot question submitted to the voters, § 8 also proscribes corporate contributions or expenditures "for the purpose of aiding, promoting or preventing the nomination or election of any person to public office, or aiding, promoting, or antagonizing the interests of any political party." See n. 2, *supra*. In this respect, the statute is not unlike many other state and federal laws regulating corporate participation in partisan candidate elections. Appellants do not challenge the constitutionality of laws prohibiting or limiting corporate contributions to political candidates or committees, or other means of influencing candidate elections. Cf. *Pipefitters* v. *United States,* 407 U. S. 385 (1972); *United States* v. *Automobile Workers,* 352 U. S. 567 (1957); *United States* v. *CIO,* 335 U. S. 106 (1948). About half of these laws, including the federal law, 2 U. S. C. § 441b (1976 ed.) (originally enacted as the Federal Corrupt Practices Act, 34 Stat. 864), by their terms do not apply to referendum votes. Several of the others proscribe or limit spending for "political" purposes, which may or may not cover referenda. See *Schwartz* v. *Romnes,* 495 F. 2d 844 (CA2 1974).

The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. See *United States* v. *Automobile Workers, supra,* at 570–575; *Schwartz* v. *Romnes, supra,* at 849–851. The importance of the governmental interest in preventing this occurrence has never been doubted. The case before us presents no comparable problem, and our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office. Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections. Cf. *Buckley* v. *Valeo, supra,* at 46; Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 U. Pa. L. Rev. 386, 408–410 (1977).

of the individual citizen in a democracy for the wise conduct of government"[27] are interests of the highest importance. *Buckley, supra; United States* v. *Automobile Workers,* 352 U. S. 567, 570 (1957); *United States* v. *CIO,* 335 U. S. 106, 139 (1948) (Rutledge, J., concurring); *Burroughs* v. *United States,* 290 U. S. 534 (1934). Preservation of the individual citizen's confidence in government is equally important. *Buckley, supra,* at 27; *CSC* v. *Letter Carriers,* 413 U. S. 548, 565 (1973).

Appellee advances a number of arguments in support of his view that these interests are endangered by corporate participation in discussion of a referendum issue. They hinge upon the assumption that such participation would exert an undue influence on the outcome of a referendum vote, and—in the end—destroy the confidence of the people in the democratic process and the integrity of government. According to appellee, corporations are wealthy and powerful and their views may drown out other points of view. If appellee's arguments were supported by record or legislative findings that corporate advocacy threatened imminently to undermine democratic processes, thereby denigrating rather than serving First Amendment interests, these arguments would merit our consideration. Cf. *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969). But there has been no showing that the relative voice of corporations has been overwhelming or even significant in influencing referenda in Massachusetts,[28] or that

---

[27] *United States* v. *Automobile Workers, supra,* at 575.

[28] In his dissenting opinion, MR. JUSTICE WHITE relies on incomplete facts with respect to expenditures in the 1972 referendum election, in support of his perception as to the "domination of the electoral process by corporate wealth." *Post,* at 811; see *post,* at 810–811. The record shows only the extent of corporate and individual contributions to the two committees that were organized to support and oppose, respectively, the constitutional amendment. It does show that three of the appellants each contributed $3,000 to the "opposition" committee. The dissenting opinion makes no reference to the fact that amounts of money expended inde-

there has been any threat to the confidence of the citizenry in government. Cf. *Wood* v. *Georgia,* 370 U. S. 375, 388 (1962).

Nor are appellee's arguments inherently persuasive or supported by the precedents of this Court. Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections, *e. g., United States* v. *Automobile Workers, supra; United States* v. *CIO, supra,* simply is not present in a popular vote on a public issue.[29] To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution "protects expression which is eloquent no less than that which is unconvincing." *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S., at 689. We noted only recently that "the concept that government may restrict the speech of some elements of our society in order

pendently of organized committees need not be reported under Massachusetts law, and therefore remain unknown.

Even if viewed as material, any inference that corporate contributions "dominated" the electoral process on this issue is refuted by the 1976 election. There the voters again rejected the proposed constitutional amendment even in the absence of any corporate spending, which had been forbidden by the decision below.

[29] See *Schwartz* v. *Romnes, supra,* at 851; *C&C Plywood Corp.* v. *Hanson,* 420 F. Supp. 1254 (Mont. 1976), appeal docketed, No. 76–3118 (CA9, Sept. 21, 1976); *Pacific Gas & Elec. Co.* v. *Berkeley,* 60 Cal. App. 3d 123, 131 Cal. Rptr. 350 (1976); *Advisory Opinion on Constitutionality of 1975 Pub. Act 227,* 396 Mich. 465, 491, 493–495, 242 N. W. 2d 3, 13, 14–15 (1976).

Appellee contends that the State's interest in sustaining the active role of the individual citizen is especially great with respect to referenda because they involve the direct participation of the people in the lawmaking process. But far from inviting greater restriction of speech, the direct participation of the people in a referendum, if anything, increases the need for " 'the widest possible dissemination of information from diverse and antagonistic sources.' " *New York Times Co.* v. *Sullivan,* 376 U. S., at 266 (quoting *Associated Press* v. *United States,* 326 U. S., at 20).

to enhance the relative voice of others is wholly foreign to the First Amendment . . . ." *Buckley*, 424 U. S., at 48–49.[30] Moreover, the people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments.[31] They may consider, in making their

---

[30] MR. JUSTICE WHITE argues, without support in the record, that because corporations are given certain privileges by law they are able to "amass wealth" and then to "dominate" debate on an issue. *Post*, at 809, 821. He concludes from this generalization that the State has a subordinating interest in denying corporations access to debate and, correspondingly, in denying the public access to corporate views. The potential impact of this argument, especially on the news media, is unsettling. One might argue with comparable logic that the State may control the volume of expression by the wealthier, more powerful corporate members of the press in order to "enhance the relative voices" of smaller and less influential members.

Except in the special context of limited access to the channels of communication, see *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969), this concept contradicts basic tenets of First Amendment jurisprudence. We rejected a similar notion in *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974). There we held that the First Amendment prohibits a State from requiring a newspaper to make space available at no cost for a reply from a candidate whom the newspaper has criticized. The state court had held that "free speech was enhanced and not abridged by the Florida right-of-reply statute, which in that court's view, furthered the 'broad societal interest in the free flow of information to the public.'" *Id.*, at 245. Far more than in the instant case, allegations were there made and substantiated of a concentration in the hands of a few of "the power to inform the American people and shape public opinion," and that "the public has lost any ability to respond or to contribute in a meaningful way to the debate on issues." *Id.*, at 250.

[31] Government is forbidden to assume the task of ultimate judgment, lest the people lose their ability to govern themselves. See *Thornhill* v. *Alabama*, 310 U. S. 88, 95 (1940); Meiklejohn, The First Amendment is an Absolute, 1961 S. Ct. Rev. 245, 263. The First Amendment rejects the "highly paternalistic" approach of statutes like § 8 which restrict what the people may hear. *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S., at 770; see *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S., at 97; *Whitney* v. *California*, 274 U. S. 357, 377

judgment, the source and credibility of the advocate.[32] But if there be any danger that the people cannot evaluate the information and arguments advanced by appellants, it is a danger contemplated by the Framers of the First Amendment. *Wood* v. *Georgia, supra.* In sum, "[a] restriction so destructive of the right of public discussion [as § 8], without greater or more imminent danger to the public interest than existed in this case, is incompatible with the freedoms secured by the First Amendment."[33]

## B

Finally, appellee argues that § 8 protects corporate shareholders, an interest that is both legitimate and traditionally within the province of state law. *Cort* v. *Ash,* 422 U. S. 66, 82–84 (1975). The statute is said to serve this interest by preventing the use of corporate resources in furtherance of

(1927) (Brandeis, J., concurring); *Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (Holmes, J., dissenting).

The State's paternalism evidenced by this statute is illustrated by the fact that Massachusetts does not prohibit lobbying by corporations, which are free to exert as much influence on the people's representatives as their resources and inclinations permit. Presumably the legislature thought its members competent to resist the pressures and blandishments of lobbying, but had markedly less confidence in the electorate. If the First Amendment protects the right of corporations to petition legislative and administrative bodies, see *California Motor Transp. Co.* v. *Trucking Unlimited,* 404 U. S. 508, 510–511 (1972); *Eastern Railroad Presidents Conf.* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127, 137–138 (1961), there hardly can be less reason for allowing corporate views to be presented openly to the people when they are to take action in their sovereign capacity.

[32] Corporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible. Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected. See *Buckley,* 424 U. S., at 66–67; *United States* v. *Harriss,* 347 U. S. 612, 625–626 (1954). In addition, we emphasized in *Buckley* the prophylactic effect of requiring that the source of communication be disclosed. 424 U. S., at 67.

[33] *Thomas* v. *Collins,* 323 U. S. 516, 537 (1945).

views with which some shareholders may disagree. This purpose is belied, however, by the provisions of the statute, which are both underinclusive and overinclusive.

The underinclusiveness of the statute is self-evident. Corporate expenditures with respect to a referendum are prohibited, while corporate activity with respect to the passage or defeat of legislation is permitted, see n. 31, *supra,* even though corporations may engage in lobbying more often than they take positions on ballot questions submitted to the voters. Nor does § 8 prohibit a corporation from expressing its views, by the expenditure of corporate funds, on any public issue until it becomes the subject of a referendum, though the displeasure of disapproving shareholders is unlikely to be any less.

The fact that a particular kind of ballot question has been singled out for special treatment undermines the likelihood of a genuine state interest in protecting shareholders. It suggests instead that the legislature may have been concerned with silencing corporations on a particular subject. Indeed, appellee has conceded that "the legislative and judicial history of the statute indicates . . . that the second crime was 'tailor-made' to prohibit corporate campaign contributions to oppose a graduated income tax amendment." Brief for Appellee 6.

Nor is the fact that § 8 is limited to banks and business corporations without relevance. Excluded from its provisions and criminal sanctions are entities or organized groups in which numbers of persons may hold an interest or membership, and which often have resources comparable to those of large corporations. Minorities in such groups or entities may have interests with respect to institutional speech quite comparable to those of minority shareholders in a corporation. Thus the exclusion of Massachusetts business trusts, real estate investment trusts, labor unions, and other associations undermines the plausibility of the State's purported concern for the persons who happen to be shareholders in the banks and corporations covered by § 8.

794

The overinclusiveness of the statute is demonstrated by the fact that § 8 would prohibit a corporation from supporting or opposing a referendum proposal even if its shareholders unanimously authorized the contribution or expenditure. Ultimately shareholders may decide, through the procedures of corporate democracy, whether their corporation should engage in debate on public issues.[34] Acting through their power to elect

[34] Appellee does not explain why the dissenting shareholder's wishes are entitled to such greater solicitude in this context than in many others where equally important and controversial corporate decisions are made by management or by a predetermined percentage of the shareholders. MR. JUSTICE WHITE's repeatedly expressed concern for corporate shareholders who may be "coerced" into supporting "causes with which they disagree" apparently is not shared by appellants' shareholders. Not a single shareholder has joined appellee in defending the Massachusetts statute or, so far as the record shows, has interposed any objection to the right asserted by the corporations to make the proscribed expenditures.

The dissent of MR. JUSTICE WHITE relies heavily on *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), and *Machinists* v. *Street*, 367 U. S. 740 (1961). These decisions involved the First Amendment rights of employees in closed or agency shops not to be compelled, as a condition of employment, to support with financial contributions the political activities of other union members with which the dissenters disagreed.

*Street* and *Abood* are irrelevant to the question presented in this case. In those cases employees were required, either by state law or by agreement between the employer and the union, to pay dues or a "service fee" to the exclusive bargaining representative. To the extent that these funds were used by the union in furtherance of political goals, unrelated to collective bargaining, they were held to be unconstitutional because they compelled the dissenting union member " 'to furnish contributions of money for the propagation of opinions which he disbelieves . . . .' " *Abood*, *supra*, at 235 n. 31 (Thomas Jefferson as quoted in I. Brant, James Madison: The Nationalist 354 (1948)).

The critical distinction here is that no shareholder has been "compelled" to contribute anything. Apart from the fact, noted by the dissent, that compulsion by the State is wholly absent, the shareholder invests in a corporation of his own volition and is free to withdraw his investment at any time and for any reason. A more relevant analogy, therefore, is to the situation where an employee voluntarily joins a union, or an individual voluntarily joins an association, and later finds himself in disagreement

the board of directors or to insist upon protective provisions in the corporation's charter, shareholders normally are presumed competent to protect their own interests. In addition to intracorporate remedies, minority shareholders generally have access to the judicial remedy of a derivative suit to challenge corporate disbursements alleged to have been made for improper corporate purposes or merely to further the personal interests of management.

Assuming, *arguendo,* that protection of shareholders is a "compelling" interest under the circumstances of this case, we find "no substantially relevant correlation between the governmental interest asserted and the State's effort" to prohibit appellants from speaking. *Shelton* v. *Tucker,* 364 U. S., at 485.

## V

Because that portion of § 8 challenged by appellants prohibits protected speech in a manner unjustified by a compelling state interest, it must be invalidated. The judgment of the Supreme Judicial Court is

*Reversed.*

Mr. Chief Justice Burger, concurring.

I join the opinion and judgment of the Court but write separately to raise some questions likely to arise in this area in the future.

---

with its stance on a political issue. The *Street* and *Abood* Courts did not address the question whether, in such a situation, the union or association must refund a portion of the dissenter's dues or, more drastically, refrain from expressing the majority's views. In addition, even apart from the substantive differences between compelled membership in a union and voluntary investment in a corporation or voluntary participation in *any* collective organization, it is by no means an automatic step from the remedy in *Abood,* which honored the interests of the minority without infringing the majority's rights, to the position adopted by the dissent which would completely silence the majority because a hypothetical minority might object.

A disquieting aspect of Massachusetts' position is that it may carry the risk of impinging on the First Amendment rights of those who employ the corporate form—as most do—to carry on the business of mass communications, particularly the large media conglomerates. This is so because of the difficulty, and perhaps impossibility, of distinguishing, either as a matter of fact or constitutional law, media corporations from corporations such as the appellants in this case.

Making traditional use of the corporate form, some media enterprises have amassed vast wealth and power and conduct many activities, some directly related—and some not—to their publishing and broadcasting activities. See *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 248–254 (1974). Today, a corporation might own the dominant newspaper in one or more large metropolitan centers, television and radio stations in those same centers and others, a newspaper chain, news magazines with nationwide circulation, national or world-wide wire news services, and substantial interests in book publishing and distribution enterprises. Corporate ownership may extend, vertically, to pulp mills and pulp timberlands to insure an adequate, continuing supply of newsprint and to trucking and steamship lines for the purpose of transporting the newsprint to the presses. Such activities would be logical economic auxiliaries to a publishing conglomerate. Ownership also may extend beyond to business activities unrelated to the task of publishing newspapers and magazines or broadcasting radio and television programs. Obviously, such far-reaching ownership would not be possible without the state-provided corporate form and its "special rules relating to such matters as limited liability, perpetual life, and the accumulation, distribution, and taxation of assets . . . ." *Post,* at 809 (WHITE, J., dissenting).

In terms of "unfair advantage in the political process" and "corporate domination of the electoral process," *post,* at 809–810, it could be argued that such media conglomerates as I de-

scribe pose a much more realistic threat to valid interests than do appellants and similar entities not regularly concerned with shaping popular opinion on public issues. See *Miami Herald Publishing Co.* v. *Tornillo, supra; ante,* at 791 n. 30. In *Tornillo,* for example, we noted the serious contentions advanced that a result of the growth of modern media empires "has been to place in a few hands the power to inform the American people and shape public opinion." 418 U. S., at 250.

In terms of Massachusetts' other concern, the interests of minority shareholders, I perceive no basis for saying that the managers and directors of the media conglomerates are more or less sensitive to the views and desires of minority shareholders than are corporate officers generally.[1] Nor can it be said, even if relevant to First Amendment analysis—which it is not—that the former are more virtuous, wise, or restrained in the exercise of corporate power than are the latter. Cf. *Columbia Broadcasting System* v. *Democratic National Comm.,* 412 U. S. 94, 124–125 (1973); 14 The Writings of Thomas Jefferson 46 (A. Libscomb ed. 1904) (letter to Dr. Walter Jones, Jan. 2, 1814). Thus, no factual distinction has been identified as yet that would justify government restraints on the right of appellants to express their views without, at the same time, opening the door to similar restraints on media conglomerates with their vastly greater influence.

Despite these factual similarities between media and non-media corporations, those who view the Press Clause as somehow conferring special and extraordinary privileges or status on the "institutional press"—which are not extended to those

---

[1] It may be that a nonmedia corporation, because of its nature, is subject to more limitations on political expression than a media corporation whose very existence is aimed at political expression. For example, the charter of a nonmedia corporation may be so framed as to render such activity or expression ultra vires; or its shareholders may be much less inclined to permit expenditure for corporate speech. Moreover, a nonmedia corporation may find it more difficult to characterize its expenditures as ordinary and necessary business expenses for tax purposes.

who wish to express ideas other than by publishing a newspaper—might perceive no danger to institutional media corporations flowing from the position asserted by Massachusetts. Under this narrow reading of the Press Clause, government could perhaps impose on nonmedia corporations restrictions not permissible with respect to "media" enterprises. Cf. Bezanson, The New Free Press Guarantee, 63 Va. L. Rev. 731, 767–770 (1977).[2] The Court has not yet squarely resolved whether the Press Clause confers upon the "institutional press" any freedom from government restraint not enjoyed by all others.[3]

I perceive two fundamental difficulties with a narrow reading of the Press Clause. First, although certainty on this point is not possible, the history of the Clause does not suggest that the authors contemplated a "special" or "institutional" privilege. See Lange, The Speech and Press Clauses, 23 UCLA L. Rev. 77, 88–99 (1975). The common 18th century understanding of freedom of the press is suggested by Andrew Bradford, a colonial American newspaperman. In defining the nature of the liberty, he did not limit it to a particular group:

> "But, by the *Freedom of the Press,* I mean a Liberty, within the Bounds of Law, for any Man to communicate to the Public, his Sentiments on the Important Points of

---

[2] It is open to question whether limitations can be placed on the free expression rights of some without undermining the guarantees of all. Experience with statutory limitations on campaign expenditures on behalf of candidates or parties may shed some light on this issue. Cf. *Buckley* v. *Valeo,* 424 U. S. 1 (1976)

[3] Language in some cases perhaps may be read as assuming or suggesting no independent scope to the Press Clause, see *Pell* v. *Procunier,* 417 U. S. 817, 834 (1974), or the contrary, see *Bigelow* v. *Virginia,* 421 U. S. 809, 828 (1975). The Court, however, has not yet focused on the issue. See Lange, The Speech and Press Clauses, 23 UCLA L. Rev. 77 (1975); Nimmer, Introduction—Is Freedom of the Press a Redundancy: What Does It Add to Freedom of Speech?, 26 Hastings L. J. 639 (1975); cf. Bezanson, The New Free Press Guarantee, 63 Va. L. Rev. 731 (1977).

*Religion* and *Government;* of proposing any Laws, which he apprehends may be for the Good of his Countrey, and of applying for the Repeal of such, as he Judges pernicious. . . .

"This is the *Liberty of the Press,* the great *Palladium* of all our other *Liberties,* which I hope the good People of this Province, will forever enjoy . . . ." A. Bradford, Sentiments on the Liberty of the Press, in L. Levy, Freedom of the Press from Zenger to Jefferson 41–42 (1966) (emphasis deleted) (first published in Bradford's The American Weekly Mercury, a Philadelphia newspaper, Apr. 25, 1734).

Indeed most pre-First Amendment commentators "who employed the term 'freedom of speech' with great frequency, used it synonomously with freedom of the press." L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 174 (1960).

Those interpreting the Press Clause as extending protection only to, or creating a special role for, the "institutional press" must either (a) assert such an intention on the part of the Framers for which no supporting evidence is available, cf. Lange, *supra,* at 89–91; (b) argue that events after 1791 somehow operated to "constitutionalize" this interpretation, see Bezanson, *supra* n. 3, at 788; or (c) candidly acknowledging the absence of historical support, suggest that the intent of the Framers is not important today. See Nimmer, *supra* n. 3, at 640–641.

To conclude that the Framers did not intend to limit the freedom of the press to one select group is not necessarily to suggest that the Press Clause is redundant. The Speech Clause standing alone may be viewed as a protection of the liberty to express ideas and beliefs,[4] while the Press Clause

---

[4] The simplest explanation of the Speech and Press Clauses might be that the former protects oral communications; the latter, written. But the historical evidence does not strongly support this explanation. The

focuses specifically on the liberty to disseminate expression broadly and "comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell* v. *Griffin,* 303 U. S. 444, 452 (1938).[5] Yet there is no fundamental distinction between expression and dissemination. The liberty encompassed by the Press Clause, although complementary to and a natural extension of Speech Clause liberty, merited special mention simply because it had been more often the object of official restraints. Soon after the invention of the printing press, English and continental monarchs, fearful of the power implicit in its use and the threat to Establishment thought and order—political and religious— devised restraints, such as licensing, censors, indices of prohibited books, and prosecutions for seditious libel, which gen-

---

first draft of what became the free expression provisions of the First Amendment, one proposed by Madison on June 8, 1789, as an addition to Art. 1, § 9, read:

"The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable." 1 Annals of Cong. 434 (1789).

The language was changed to its current form, "freedom of speech, or of the press," by the Committee of Eleven to which Madison's amendments were referred. (There is no explanation for the change and the language was not altered thereafter.) It seems likely that the Committee shortened Madison's language preceding the semicolon in his draft to "freedom of speech" without intending to diminish the scope of protection contemplated by Madison's phrase; in short, it was a stylistic change.

Cf. *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881); *Doe* v. *McMillan,* 412 U. S. 306 (1973) (Speech or Debate Clause extends to both spoken and written expressions within the legislative function).

[5] It is not strange that "press," the word for what was then the sole means of broad dissemination of ideas and news, would be used to describe the freedom to communicate with a large, unseen audience.

Changes wrought by 20th century technology, of course, have rendered the printing press as it existed in 1791 as obsolete as Watt's copying or letter press. It is the core meaning of "press" as used in the constitutional text which must govern.

erally were unknown in the pre-printing press era. Official restrictions were the official response to the new, disquieting idea that this invention would provide a means for mass communication.

The second fundamental difficulty with interpreting the Press Clause as conferring special status on a limited group is one of definition. See Lange, *supra,* at 100–107. The very task of including some entities within the "institutional press" while excluding others, whether undertaken by legislature, court, or administrative agency, is reminiscent of the abhorred licensing system of Tudor and Stuart England—a system the First Amendment was intended to ban from this country. *Lovell* v. *Griffin, supra,* at 451–452. Further, the officials undertaking that task would be required to distinguish the protected from the unprotected on the basis of such variables as content of expression, frequency or fervor of expression, or ownership of the technological means of dissemination. Yet nothing in this Court's opinions supports such a confining approach to the scope of Press Clause protection.[6] Indeed, the Court has plainly intimated the contrary view:

> "Freedom of the press is a 'fundamental personal right' which 'is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.' . . . The informative function asserted by representatives of the organized press . . . is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow

---

[6] *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931), which examined the meaning of freedom of the press, did not involve a traditional institutionalized newspaper but rather an occasional publication (nine issues) more nearly approximating the product of a pamphleteer than the traditional newspaper.

of information to the public . . . ." *Branzburg* v. *Hayes,* 408 U. S. 665, 704–705 (1972), quoting *Lovell* v. *Griffin, supra,* at 450, 452.

The meaning of the Press Clause, as a provision separate and apart from the Speech Clause, is implicated only indirectly by this case. Yet Massachusetts' position poses serious questions. The evolution of traditional newspapers into modern corporate conglomerates in which the daily dissemination of news by print is no longer the major part of the whole enterprise suggests the need for caution in limiting the First Amendment rights of corporations as such. Thus, the tentative probings of this brief inquiry are wholly consistent, I think, with the Court's refusal to sustain § 8's serious and potentially dangerous restriction on the freedom of political speech.

Because the First Amendment was meant to guarantee freedom to express and communicate ideas, I can see no difference between the right of those who seek to disseminate ideas by way of a newspaper and those who give lectures or speeches and seek to enlarge the audience by publication and wide dissemination. "[T]he purpose of the Constitution was not to erect the press into a privileged institution but to protect all persons in their right to print what they will as well as to utter it. '. . . the liberty of the press is no greater and no less . . .' than the liberty of every citizen of the Republic." *Pennekamp* v. *Florida,* 328 U. S. 331, 364 (1946) (Frankfurter, J., concurring).

In short, the First Amendment does not "belong" to any definable category of persons or entities: It belongs to all who exercise its freedoms.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The Massachusetts statute challenged here forbids the use of corporate funds to publish views about referenda issues having no material effect on the business, property, or assets of

the corporation. The legislative judgment that the personal income tax issue, which is the subject of the referendum out of which this case arose, has no such effect was sustained by the Supreme Judicial Court of Massachusetts and is not disapproved by this Court today. Hence, as this case comes to us, the issue is whether a State may prevent corporate management from using the corporate treasury to propagate views having no connection with the corporate business. The Court commendably enough squarely faces the issue but unfortunately errs in deciding it. The Court invalidates the Massachusetts statute and holds that the First Amendment guarantees corporate managers the right to use not only their personal funds, but also those of the corporation, to circulate fact and opinion irrelevant to the business placed in their charge and necessarily representing their own personal or collective views about political and social questions. I do not suggest for a moment that the First Amendment requires a State to forbid such use of corporate funds, but I do strongly disagree that the First Amendment forbids state interference with managerial decisions of this kind.

By holding that Massachusetts may not prohibit corporate expenditures or contributions made in connection with referenda involving issues having no material connection with the corporate business, the Court not only invalidates a statute which has been on the books in one form or another for many years, but also casts considerable doubt upon the constitutionality of legislation passed by some 31 States restricting corporate political activity,[1] as well as upon the Federal Corrupt Practices Act, 2 U. S. C. § 441b (1976 ed.). The Court's fundamental error is its failure to realize that the state regulatory interests in terms of which the alleged curtailment

---

[1] Library of Congress, Analysis of Federal and State Campaign Finance Laws—Summaries, prepared for Federal Election Commission (1977). Some 18 of these States prohibit or limit corporate contributions in respect to ballot questions. Reply Brief for Appellants 9–11, n. 6.

of First Amendment rights accomplished by the statute must be evaluated are themselves derived from the First Amendment. The question posed by this case, as approached by the Court, is whether the State has struck the best possible balance, i. e., the one which it would have chosen, between competing First Amendment interests. Although in my view the choice made by the State would survive even the most exacting scrutiny, perhaps a rational argument might be made to the contrary. What is inexplicable, is for the Court to substitute its judgment as to the proper balance for that of Massachusetts where the State has passed legislation reasonably designed to further First Amendment interests in the context of the political arena where the expertise of legislators is at its peak and that of judges is at its very lowest.[2] Moreover, the result reached today in critical respects marks a drastic departure from the Court's prior decisions which have protected against governmental infringement the very First Amendment interests which the Court now deems inadequate to justify the Massachusetts statute.

I

There is now little doubt that corporate communications come within the scope of the First Amendment. This, however, is merely the starting point of analysis, because an examination of the First Amendment values that corporate expression furthers and the threat to the functioning of a free society it is capable of posing reveals that it is not fungible with communications emanating from individuals and is subject to restrictions which individual expression is not. Indeed, what some have considered to be the principal function of the First Amendment, the use of communication as a means of self-expression, self-realization, and self-fulfillment, is not at all

---

[2] See generally Leventhal, Courts and Political Thickets, 77 Colum. L. Rev. 345 (1977).

furthered by corporate speech.[3]  It is clear that the communications of profitmaking corporations are not "an integral part of the development of ideas, of mental exploration and of the affirmation of self." [4]  They do not represent a manifestation of individual freedom or choice.  Undoubtedly, as this Court has recognized, see *NAACP* v. *Button,* 371 U. S. 415 (1963), there are some corporations formed for the express purpose of advancing certain ideological causes shared by all their members, or, as in the case of the press, of disseminating information and ideas.  Under such circumstances, association in a corporate form may be viewed as merely a means of achieving effective self-expression.  But this is hardly the case generally with corporations operated for the purpose of making profits. Shareholders in such entities do not share a common set of political or social views, and they certainly have not invested their money for the purpose of advancing political or social causes or in an enterprise engaged in the business of disseminating news and opinion.  In fact, as discussed *infra,* the government has a strong interest in assuring that investment decisions are not predicated upon agreement or disagreement with the activities of corporations in the political arena.

Of course, it may be assumed that corporate investors are united by a desire to make money, for the value of their investment to increase.  Since even communications which have no purpose other than that of enriching the communicator have some First Amendment protection, activities such as advertising and other communications integrally related to the operation of the corporation's business may be viewed as a means of furthering the desires of individual shareholders.[5] This unanimity of purpose breaks down, however, when corporations make expenditures or undertake activities designed

---

[3] See T. Emerson, Toward a General Theory of the First Amendment 4–7 (1966); *Board of Education* v. *Barnette,* 319 U. S. 624 (1943).

[4] Emerson, *supra,* at 5.

[5] See *United States* v. *CIO,* 335 U. S. 106, 122–123 (1948).

to influence the opinion or votes of the general public on political and social issues that have no material connection with or effect upon their business, property, or assets. Although it is arguable that corporations make such expenditures because their managers believe that it is in the corporations' economic interest to do so, there is no basis whatsoever for concluding that these views are expressive of the heterogeneous beliefs of their shareholders whose convictions on many political issues are undoubtedly shaped by considerations other than a desire to endorse any electoral or ideological cause which would tend to increase the value of a particular corporate investment. This is particularly true where, as in this case, whatever the belief of the corporate managers may be, they have not been able to demonstrate that the issue involved has any material connection with the corporate business. Thus when a profitmaking corporation contributes to a political candidate this does not further the self-expression or self-fulfillment of its shareholders in the way that expenditures from them as individuals would.[6]

The self-expression of the communicator is not the only value encompassed by the First Amendment. One of its functions, often referred to as the right to hear or receive information, is to protect the interchange of ideas. Any communication of ideas, and consequently any expenditure of funds which makes the communication of ideas possible, it

---

[6] This distinguishes the regulation of corporate speech from the limitations upon individual political campaign expenditures invalidated in *Buckley* v. *Valeo*, 424 U. S. 1 (1976). The Court there struck down the limitations upon individual expenditures because they impermissibly restricted the right of individuals to speak their minds and make their views known. *Id.*, at 48, 52. At the same time, however, the Court sustained limitations upon political contributions on the ground that such provisions entail a much lesser restriction upon the individual's ability to engage in free communication than expenditure restrictions. *Id.*, at 20–23. In the case of corporate political activities, we are not at all concerned with the self-expression of the communicator.

can be argued, furthers the purposes of the First Amendment. This proposition does not establish, however, that the right of the general public to receive communications financed by means of corporate expenditures is of the same dimension as that to hear other forms of expression. In the first place, as discussed *supra,* corporate expenditures designed to further political causes lack the connection with individual self-expression which is one of the principal justifications for the constitutional protection of speech provided by the First Amendment. Ideas which are not a product of individual choice are entitled to less First Amendment protection. Secondly, the restriction of corporate speech concerned with political matters impinges much less severely upon the availability of ideas to the general public than do restrictions upon individual speech. Even the complete curtailment of corporate communications concerning political or ideological questions not integral to day-to-day business functions would leave individuals, including corporate shareholders, employees, and customers, free to communicate their thoughts. Moreover, it is unlikely that any significant communication would be lost by such a prohibition. These individuals would remain perfectly free to communicate any ideas which could be conveyed by means of the corporate form. Indeed, such individuals could even form associations for the very purpose of promoting political or ideological causes.[7]

I recognize that there may be certain communications undertaken by corporations which could not be restricted without impinging seriously upon the right to receive information. In the absence of advertising and similar promotional activities, for example, the ability of consumers to obtain information relating to products manufactured by cor-

---

[7] This is in contrast to the limitations upon individual campaign expenditures in *Buckley* v. *Valeo, supra,* which the Court viewed as heavily burdening the exchange of ideas between individuals and the forming of associations for that purpose. 424 U. S., at 19–20, 47–48.

porations would be significantly impeded. There is also a need for employees, customers, and shareholders of corporations to be able to receive communications about matters relating to the functioning of corporations. Such communications are clearly desired by all investors and may well be viewed as an associational form of self-expression. See *United States* v. *CIO*, 335 U. S. 106, 121–123 (1948). Moreover, it is unlikely that such information would be disseminated by sources other than corporations. It is for such reasons that the Court has extended a certain degree of First Amendment protection to activities of this kind.[8] None of these considerations, however, are implicated by a prohibition upon corporate expenditures relating to referenda concerning questions of general public concern having no connection with corporate business affairs.

It bears emphasis here that the Massachusetts statute forbids the expenditure of corporate funds in connection with referenda but in no way forbids the board of directors of a corporation from formulating and making public what it represents as the views of the corporation even though the subject addressed has no material effect whatsoever on the business of the corporation. These views could be publicized at the indi-

---

[8] In addition, newspapers and other forms of literature obviously do not lose their First Amendment protection simply because they are produced or distributed by corporations. It is, of course, impermissible to restrict any communication, corporate or otherwise, because of displeasure with its content. I need not decide whether newspapers have a First Amendment right to operate in a corporate form. It may be that for a State which generally permits businesses to operate as corporations to prohibit those engaged in the dissemination of information and opinion from taking advantage of the corporate form would constitute a departure from neutrality prohibited by the free press guarantee of the First Amendment. See Stewart, "Or of the Press," 26 Hastings L. J. 631 (1975); Bezanson, The New Free Press Guarantee, 63 Va. L. Rev. 731 (1977). There can be no doubt, however, that the First Amendment does not immunize media corporations any more than other types of corporations from restrictions upon electoral contributions and expenditures.

vidual expense of the officers, directors, stockholders, or anyone else interested in circulating the corporate view on matters irrelevant to its business.

The governmental interest in regulating corporate political communications, especially those relating to electoral matters, also raises considerations which differ significantly from those governing the regulation of individual speech. Corporations are artificial entities created by law for the purpose of furthering certain economic goals. In order to facilitate the achievement of such ends, special rules relating to such matters as limited liability, perpetual life, and the accumulation, distribution, and taxation of assets are normally applied to them. States have provided corporations with such attributes in order to increase their economic viability and thus strengthen the economy generally. It has long been recognized, however, that the special status of corporations has placed them in a position to control vast amounts of economic power which may, if not regulated, dominate not only the economy but also the very heart of our democracy, the electoral process. Although *Buckley* v. *Valeo,* 424 U. S. 1 (1976), provides support for the position that the desire to equalize the financial resources available to candidates does not justify the limitation upon the expression of support which a restriction upon individual contributions entails,[9] the interest of Massachusetts and the many other States which have restricted corporate political activity is quite different. It is not one of equalizing the resources of opposing candidates or opposing positions, but rather of preventing institutions which have been permitted to amass wealth as a result of special advantages extended by the State for certain economic purposes from using that wealth to acquire an unfair advantage in the political process, especially where, as here, the issue involved has no material connection with the business of the corporation. The State need not permit its own creation to consume it. Massachusetts could

---

[9] *Buckley* v. *Valeo,* 424 U. S., at 48–49, 54, 56–57.

permissibly conclude that not to impose limits upon the political activities of corporations would have placed it in a position of departing from neutrality and indirectly assisting the propagation of corporate views because of the advantages its laws give to the corporate acquisition of funds to finance such activities. Such expenditures may be viewed as seriously threatening the role of the First Amendment as a guarantor of a free marketplace of ideas. Ordinarily, the expenditure of funds to promote political causes may be assumed to bear some relation to the fervency with which they are held. Corporate political expression, however, is not only divorced from the convictions of individual corporate · shareholders, but also, because of the ease with which corporations are permitted to accumulate capital, bears no relation to the conviction with which the ideas expressed are held by the communicator.[10]

The Court's opinion appears to recognize at least the possibility that fear of corporate domination of the electoral process would justify restrictions upon corporate expenditures and contributions in connection with referenda but brushes this interest aside by asserting that "there has been no showing that the relative voice of corporations has been overwhelming or even significant in influencing referenda in Massachusetts," *ante,* at 789, and by suggesting that the statute in issue represents an attempt to give an unfair advantage to those who hold views in opposition to positions which would otherwise be financed by corporations. *Ante,* at 785–786. It fails even to allude to the fact, however, that Massachusetts' most recent experience with unrestrained corporate expenditures in connection

---

[10] Congress long ago recognized that the ability to communicate ideas without cost could create an unfair political advantage. See 54 Cong. Rec. 2039–2041 (1917); Association of the Bar of the City of New York, Special Committee on the Federal Conflict of Interest Laws, Conflicts of Interest and Federal Service 54–55 (1960) (franking privilege denied by Congress to part-time employees ("dollar-a-year men") of the Bureau of Education).

with ballot questions establishes precisely the contrary. In 1972, a proposed amendment to the Massachusetts Constitution which would have authorized the imposition of a graduated income tax on both individuals and corporations was put to the voters. The Committee for Jobs and Government Economy, an organized political committee, raised and expended approximately $120,000 to oppose the proposed amendment, the bulk of it raised through large corporate contributions. Three of the present appellant corporations each contributed $3,000 to this committee. In contrast, the Coalition for Tax Reform, Inc., the only political committee organized to support the 1972 amendment, was able to raise and expend only approximately $7,000. App. to Jurisdictional Statement 41; App. to Record 48–84. Perhaps these figures reflect the Court's view of the appropriate role which corporations should play in the Massachusetts electoral process, but it nowhere explains why it is entitled to substitute its judgment for that of Massachusetts and other States,[11] as well as the United States, which have acted to correct or prevent similar domination of the electoral process by corporate wealth.

This Nation has for many years recognized the need for measures designed to prevent corporate domination of the political process. The Corrupt Practices Act, first enacted in 1907, has consistently barred corporate contributions in con-

---

[11] California had the same experience in connection with a 1976 referendum measure which would have required legislative approval of nuclear generating plant sites. Two hundred and three corporations contributed approximately $2,530,000 in opposition to the amendment, which was defeated. Supporters of the measure collected altogether only approximately $1,600,000. California Fair Political Practices Comm'n, Campaign Contribution and Spending Report—June 8, 1976, Primary Election 289–298. Later in the same year a similar initiative measure was placed on the ballot in Montana. Corporations contributed approximately $144,000 in opposition to the measure, while its supporters were able to collect only $451. This measure was also defeated. Brief for State of Montana as *Amicus Curiae* 10.

nection with federal elections. This Court has repeatedly recognized that one of the principal purposes of this prohibition is "to avoid the deleterious influences on federal elections resulting from the use of money by those who exercise control over large aggregations of capital." *United States* v. *Automobile Workers,* 352 U. S. 567, 585 (1957). See *Pipefitters* v. *United States,* 407 U. S. 385, 415–416 (1972); *United States* v. *CIO,* 335 U. S., at 113. Although this Court has never adjudicated the constitutionality of the Act, there is no suggestion in its cases construing it, cited *supra,* that this purpose is in any sense illegitimate or deserving of other than the utmost respect; indeed, the thrust of its opinions, until today, has been to the contrary. See *Automobile Workers, supra,* at 585; *Pipefitters, supra,* at 415–416.

## II

There is an additional overriding interest related to the prevention of corporate domination which is substantially advanced by Massachusetts' restrictions upon corporate contributions: assuring that shareholders are not compelled to support and financially further beliefs with which they disagree where, as is the case here, the issue involved does not materially affect the business, property, or other affairs of the corporation.[12] The State has not interfered with the prerogatives of corporate management to communicate about matters that have material impact on the business affairs entrusted to them, however much individual stockholders may disagree on economic or ideological grounds. Nor has the State forbidden management from formulating and circulating its views at its own expense or at the expense of others, even where the subject at issue is irrelevant to corporate business affairs. But Massachusetts

---

[12] This, of course, is an interest that was not present in *Buckley* v. *Valeo, supra,* and would not justify limitations upon the activities of associations, corporate or otherwise, formed for the express purpose of advancing a political or social cause.

*has* chosen to forbid corporate management from spending corporate funds in referenda elections absent some demonstrable effect of the issue on the economic life of the company. In short, corporate management may not use corporate monies to promote what does not further corporate affairs but what in the last analysis are the purely personal views of the management, individually or as a group.

This is not only a policy which a State may adopt consistent with the First Amendment but one which protects the very freedoms that this Court has held to be guaranteed by the First Amendment. In *Board of Education* v. *Barnette,* 319 U. S. 624 (1943), the Court struck down a West Virginia statute which compelled children enrolled in public school to salute the flag and pledge allegiance to it on the ground that the First Amendment prohibits public authorities from requiring an individual to express support for or agreement with a cause with which he disagrees or concerning which he prefers to remain silent. Subsequent cases have applied this principle to prohibit organizations to which individuals are compelled to belong as a condition of employment from using compulsory dues to support candidates, political parties, or other forms of political expression which which members disagree or do not wish to support. In *Machinists* v. *Street,* 367 U. S. 740 (1961), the Court was presented with allegations that a union shop authorized by the Railway Labor Act, 45 U. S. C. § 152 Eleventh, had used the union treasury to which all employees were compelled to contribute "to finance the campaigns of candidates for federal and state offices whom [the petitioners] opposed, and to promote the propagation of political and economic doctrines, concepts and ideologies with which [they] disagreed." 367 U. S., at 744. The Court recognized that compelling contributions for such purposes presented constitutional "questions of the utmost gravity" and consequently construed the Act to prohibit the use of compulsory union dues for political purposes. *Id.,* at 749–750. Last Term,

in *Abood* v. *Detroit Board of Education,* 431 U. S. 209 (1977), we confronted these constitutional questions and held that a State may not, even indirectly, require an individual to contribute to the support of an ideological cause he may oppose as a condition of employment. At issue were political expenditures made by a public employees' union. Michigan law provided that unions and local government employers might agree to an agency-shop arrangement pursuant to which every employee—even those not union members—must pay to the union, as a condition of employment, union dues or a service fee equivalent in amount to union dues. The legislation itself was not coercive; it did not command that local governments employ only those workers who were willing to pay union dues, but left it to a bargaining representative democratically elected by a majority of the employees to enter or not enter into such a contractual arrangement through collective bargaining. In addition, of course, no one was compelled to work at a job covered by an agency-shop arrangement. Nevertheless, the Court ruled that under such circumstances the use of funds contributed by dissenting employees for political purposes impermissibly infringed their First Amendment right to adhere to their own beliefs and to refuse to defer to or support the beliefs of others.

Presumably, unlike the situations presented by *Street* and *Abood,* the use of funds invested by shareholders with opposing views by Massachusetts corporations in connection with referenda or elections would not constitute state action and, consequently, would not violate the First Amendment. Until now, however, the States have always been free to adopt measures designed to further rights protected by the Constitution even when not compelled to do so. It could hardly be plausibly contended that just because Massachusetts' regulation of corporations is less extensive than Michigan's regulation of labor-management relations, Massachusetts may not constitutionally prohibit the very evil which Michigan may not consti-

tutionally permit. Yet this is precisely what the Court today holds. Although the Court places great stress upon the alleged infringement of the right to receive information produced by Massachusetts' ban on corporate expenditures which, for the reasons stated *supra,* I believe to be misconceived, it fails to explain why such an interest was not sufficient to compel a different weighing of First Amendment interests and, consequently, a different result in *Abood.* After all, even contributions for political causes coerced by labor unions would, under the Court's analysis, increase unions' ability to disseminate their views and, consequently, increase the amount of information available to the general public.

The Court assumes that the interest in preventing the use of corporate resources in furtherance of views which are irrelevant to the corporate business and with which some shareholders may disagree is a compelling one, but concludes that the Massachusetts statute is nevertheless invalid because the State has failed to adopt the means best suited, in its opinion, for achieving this end. *Ante,* at 792–795. It proposes that the aggrieved shareholder assert his interest in preventing the expenditure of funds for nonbusiness causes he finds unconscionable through the channels provided by "corporate democracy" and purports to be mystified as to "why the dissenting shareholder's wishes are entitled to such greater solicitude in this context than in many others where equally important and controversial corporate decisions are made by management or by a predetermined percentage of the shareholders." *Ante,* at 794, and n. 34. It should be obvious that the alternative means upon the adequacy of which the majority is willing to predicate a constitutional adjudication is no more able to satisfy the State's interest than a ruling in *Street* and *Abood* leaving aggrieved employees to the remedies provided by union democracy would have satisfied the demands of the First Amendment. The interest which the State wishes to protect here is identical to that which the Court has previously held to be protected by

the First Amendment: the right to adhere to one's own beliefs and to refuse to support the dissemination of the personal and political views of others, regardless of how large a majority they may compose. In most contexts, of course, the views of the dissenting shareholder have little, if any, First Amendment significance. By purchasing interests in corporations shareholders accept the fact that corporations are going to make decisions concerning matters such as advertising integrally related to their business operations according to the procedures set forth in their charters and bylaws. Otherwise, corporations could not function. First Amendment concerns of stockholders are directly implicated, however, when a corporation chooses to use its privileged status to finance ideological crusades which are unconnected with the corporate business or property and which some shareholders might not wish to support. Once again, we are provided no explanation whatsoever by the Court as to why the State's interest is of less constitutional weight than that of corporations to participate financially in the electoral process and as to why the balance between two First Amendment interests should be struck by this Court. Moreover, the Court offers no reason whatsoever for constitutionally imposing its choice of means to achieve a legitimate goal and invalidating those chosen by the State.[13]

---

[13] The Court's additional suggestion that the aggrieved shareholder pursue judicial remedies to challenge corporate referenda disbursements, *ante,* at 795, is untenable in light of its holding precluding Massachusetts from defining the powers of corporations active within its borders so as to prohibit the expenditure of funds in connection with referenda campaigns not material to their business functions.

The Court also asserts that Massachusetts' interest in protecting dissenting shareholders is "belied" by its failure to prohibit corporate activity with respect to the passage or defeat of legislation or to include business trusts, real estate investment trusts, and labor unions in its prohibition upon electoral expenditures. *Ante,* at 792–793. It strongly implies that what it views as "underinclusiveness" weakens the consideration to which the interest asserted by Massachusetts is entitled by this Court. Such a

*Abood* cannot be distinguished, as the present Court attempts to do, *ante,* at 794–795, n. 34, on the ground that the Court there did not constitutionally prohibit expenditures by unions for the election of political candidates or for ideological causes so long as they are financed from assessments paid by employees who are not coerced into doing so against their will. In the first place, the Court did not purport to hold that all political or ideological expenditures not constitutionally prohibited were constitutionally protected. A State might well conclude that the most and perhaps, in its view, the only effective way of preventing unions or corporations from using funds contributed by differing members or shareholders to support political causes having no connection with the business of the organization is to absolutely ban such expenditures.

---

conclusion, however, is without justification. No basis whatsoever is offered by the Court for rejecting the conclusion reached by the court below in dismissing appellants' equal protection challenge that the state legislature could permissibly find on the basis of experience, which this Court lacks, that other activities and forms of association do not present problems of the same type or the same dimension. 371 Mass. 773, 794, 359 N. E. 2d 1262, 1275 (1977). Indeed, the Court declines to consider appellants' equal protection challenge. *Ante,* at 774 n. 8.

The Court's further claim that "[t]he fact that a particular kind of ballot question has been singled out for special treatment undermines the likelihood of a genuine state interest in protecting shareholders [and] suggests instead that the legislature may have been concerned with silencing corporations on a particular subject," *ante,* at 793, ignores the fact that, as earlier acknowledged by the majority, *ante,* at 769–770, n. 3, the statutory provision stating that the personal income tax does not materially affect the business of corporations was enacted in response to prior judicial decisions construing the "materially affecting" requirement as not prohibiting corporate expenditures in connection with income tax referenda. To find evidence of hostility toward corporations on the basis of a decision of a legislature to clarify its intent following judicial rulings interpreting the scope of a statute is to elevate corporations to a level of deference which has not been seen at least since the days when substantive due process was regularly used to invalidate regulatory legislation thought to unfairly impinge upon established economic interests.

Secondly, unlike the remedies available to the Court in *Street* and *Abood* which required unions to refund the exacted funds in the proportion that union political expenditures with which a member disagreed bore to total union expenditures, no such alternative is readily available which would enable a corporate shareholder to maintain his investment in a corporation without supporting its electoral or political ventures other than prohibiting corporations from participating in such activities. There is no apparent way of segregating one shareholder's ownership interest in a corporation from another's. It is no answer to respond, as the Court does, that the dissenting "shareholder is free to withdraw his investment at any time and for any reason." *Ante,* at 794 n. 34. The employees in *Street* and *Abood* were also free to seek other jobs where they would not be compelled to finance causes with which they disagreed, but we held in *Abood* that First Amendment rights could not be so burdened. Clearly the State has a strong interest in assuring that its citizens are not forced to choose between supporting the propagation of views with which they disagree and passing up investment opportunities.

Finally, even if corporations developed an effective mechanism for rebating to shareholders that portion of their investment used to finance political activities with which they disagreed, a State may still choose to restrict corporate political activity irrelevant to business functions on the grounds that many investors would be deterred from investing in corporations because of a wish not to associate with corporations propagating certain views. The State has an interest not only in enabling individuals to exercise freedom of conscience without penalty but also in eliminating the danger that investment decisions will be significantly influenced by the ideological views of corporations. While the latter concern may not be of the same constitutional magnitude as the former, it is far from trivial. Corporations, as previously noted, are created by the State as a means of furthering the public welfare. One of

their functions is to determine, by their success in obtaining funds, the uses to which society's resources are to be put. A State may legitimately conclude that corporations would not serve as economically efficient vehicles for such decisions if the investment preferences of the public were significantly affected by their ideological or political activities. It has long been recognized that such pursuits are not the proper business of corporations. The common law was generally interpreted as prohibiting corporate political participation.[14] Indeed, the Securities and Exchange Commission's rules permit corporations to refuse to submit for shareholder vote any proposal which concerns a general economic, political, racial, religious, or social cause that is not significantly related to the business of the corporation or is not within its control.[15]

The necessity of prohibiting corporate political expenditures in order to prevent the use of corporate funds for purposes with which shareholders may disagree is not a unique perception of Massachusetts. This Court has repeatedly recognized that one of the purposes of the Corrupt Practices Act was to prevent the use of corporate or union funds for political purposes without the consent of the shareholders or union members and to protect minority interests from domination by corporate or union leadership.[16] Although the Court has never, as noted *supra,* adjudicated the constitutionality of the Act, it has consistently treated this objective with deference. Indeed, in *United States* v. *CIO,* 335 U. S. 106 (1948), the Court construed a previous version of the Corrupt Practices Act so as to

---

[14] See Note, Corporate Political Affairs Programs, 70 Yale L. J. 821, 852–853 (1961), and cases therein cited.

[15] See Rule 14a–8 (c) of the Securities and Exchange Commission, 17 CFR § 240.14a–8 (c) (1977); *SEC* v. *Medical Committee for Human Rights,* 404 U. S. 403 (1972).

[16] See *Pipefitters* v. *United States,* 407 U. S. 385, 413–414 (1972); *United States* v. *Automobile Workers,* 352 U. S. 567, 572–573 (1957); *United States* v. *CIO,* 335 U. S., at 113, 115.

conform its prohibitions to those activities to which the Court believed union members or shareholders might object. After noting that if the statute "were construed to prohibit the publication, by corporations and unions in the regular course of conducting their affairs, of periodicals advising their members, stockholders or customers of danger or advantage to their interests from the adoption of measures, or the election to office of men espousing such measures, the gravest doubt would arise in our minds as to its constitutionality," *id.*, at 121, the Court held that the statute did not prohibit such in-house publications. It was persuaded that the purposes of the Act would not be impeded by such an interpretation, because it "is unduly stretching language to say that the members or stockholders are unwilling participants in such normal organizational activities, including the advocacy thereby of governmental policies affecting their interests, and the support thereby of candidates thought to be favorable to their interests." *Id.*, at 123.

The Court today purports not to foreclose the possibility that the Corrupt Practices Act and state statutes which prohibit corporate expenditures only in the context of elections to public office may survive constitutional scrutiny because of the interest in preventing the corruption of elected representatives through the creation of political debts. *Ante,* at 788 n. 26. It does not choose to explain or even suggest, however, why the state interests which it so cursorily dismisses are less worthy than the interest in preventing corruption or the appearance of it. More importantly, the analytical framework employed by the Court clearly raises great doubt about the Corrupt Practices Act. The question in the present case, as viewed by the Court, "is whether the corporate identity of the speaker deprives this proposed speech of what otherwise would be its clear entitlement to protection," *ante,* at 778, which it answers in the negative. But the Court has previously held in *Buckley* v. *Valeo* that the interest in preventing corruption is insufficient to justify restrictions upon individual expend-

itures relative to candidates for political office. If the corporate identity of the speaker makes no difference, all the Court has done is to reserve the formal interment of the Corrupt Practices Act and similar state statutes for another day. As I understand the view that has now become part of First Amendment jurisprudence, the use of corporate funds, even for causes irrelevant to the corporation's business, may be no more limited than that of individual funds. Hence, corporate contributions to and expenditures on behalf of political candidates may be no more limited than those of individuals. Individual contributions under federal law are limited but not entirely forbidden, and under *Buckley* v. *Valeo* expenditures may not constitutionally be limited at all. Most state corrupt practices Acts, like the federal Act, forbid *any* contributions or expenditures by corporations to or for a political candidate.

In my view, the interests in protecting a system of freedom of expression, set forth *supra,* are sufficient to justify any incremental curtailment in the volume of expression which the Massachusetts statute might produce. I would hold that apart from corporate activities, such as those discussed in Part I, *supra,* and exempted from regulation in *CIO,* which are integrally related to corporate business operations, a State may prohibit corporate expenditures for political or ideological purposes. There can be no doubt that corporate expenditures in connection with referenda immaterial to corporate business affairs fall clearly into the category of corporate activities which may be barred. The electoral process, of course, is the essence of our democracy. It is an arena in which the public interest in preventing corporate domination and the coerced support by shareholders of causes with which they disagree is at its strongest and any claim that corporate expenditures are integral to the economic functioning of the corporation is at its weakest.[17]

---

[17] The exemption provided by the Massachusetts statute for contributions and expenditures in connection with any referendum question "mate-

I would affirm the judgment of the Supreme Judicial Court for the Commonwealth of Massachusetts.

MR. JUSTICE REHNQUIST, dissenting.

This Court decided at an early date, with neither argument nor discussion, that a business corporation is a "person" entitled to the protection of the Equal Protection Clause of the Fourteenth Amendment. *Santa Clara County* v. *Southern Pacific R. Co.,* 118 U. S. 394, 396 (1886). Likewise, it soon became accepted that the property of a corporation was protected under the Due Process Clause of that same Amendment. See, *e. g., Smyth* v. *Ames,* 169 U. S. 466, 522 (1898). Nevertheless, we concluded soon thereafter that the liberty protected by that Amendment "is the liberty of natural, not artificial persons." *Northwestern Nat. Life Ins. Co.* v. *Riggs,* 203 U. S. 243, 255 (1906). Before today, our only considered and explicit departures from that holding have been that a corporation engaged in the business of publishing or broadcasting enjoys the same liberty of the press as is enjoyed by natural persons, *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244 (1936), and that a nonprofit membership corporation organized for the purpose of "achieving . . . equality of treatment by all government, federal, state and local, for the members of the Negro community" enjoys certain liberties of political expression. *NAACP* v. *Button,* 371 U. S. 415, 429 (1963).

The question presented today, whether business corporations have a constitutionally protected liberty to engage in political activities, has never been squarely addressed by any previous decision of this Court.[1] However, the General Court

---

rially affecting any of the property, business or assets of the corporation" affords any First Amendment protection to which corporate electoral communications may be entitled. See Mass. Gen. Laws Ann., ch. 55, § 8 (West Supp. 1977).

[1] Our prior cases, mostly of recent vintage, have discussed the boundaries of protected speech without distinguishing between artificial and natural persons. See, *e. g., Linmark Associates, Inc.* v. *Willingboro,* 431

of the Commonwealth of Massachusetts, the Congress of the United States, and the legislatures of 30 other States of this Republic have considered the matter, and have concluded that restrictions upon the political activity of business corporations are both politically desirable and constitutionally permissible. The judgment of such a broad consensus of governmental bodies expressed over a period of many decades is entitled to considerable deference from this Court. I think it quite probable that their judgment may properly be reconciled with our controlling precedents, but I am certain that under my views of the limited application of the First Amendment to the States, which I share with the two immediately preceding occupants of my seat on the Court, but not with my present colleagues, the judgment of the Supreme Judicial Court of Massachusetts should be affirmed.

Early in our history, Mr. Chief Justice Marshall described the status of a corporation in the eyes of federal law:

> "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created." *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 636 (1819).

The appellants herein either were created by the Commonwealth or were admitted into the Commonwealth only for the limited purposes described in their charters and regulated by

---

U. S. 85 (1977); *Buckley* v. *Valeo,* 424 U. S. 1 (1976). Nevertheless, the Court today affirms that the failure of those cases to draw distinctions between artificial and natural persons does not mean that no such distinctions may be drawn. The Court explicitly states that corporations may not enjoy all the political liberties of natural persons, although it fails to articulate the basis of its suggested distinction. *Ante,* at 777–778, n. 13.

state law.[2]  Since it cannot be disputed that the mere creation of a corporation does not invest it with all the liberties enjoyed by natural persons, *United States* v. *White,* 322 U. S. 694, 698–701 (1944) (corporations do not enjoy the privilege against self-incrimination), our inquiry must seek to determine which constitutional protections are "incidental to its very existence." *Dartmouth College, supra,* at 636.

There can be little doubt that when a State creates a corporation with the power to acquire and utilize property, it necessarily and implicitly guarantees that the corporation will not be deprived of that property absent due process of law. Likewise, when a State charters a corporation for the purpose of publishing a newspaper, it necessarily assumes that the corporation is entitled to the liberty of the press essential to the conduct of its business.[3]  *Grosjean* so held, and our subsequent cases have so assumed. *E. g., Time, Inc.* v. *Firestone,* 424 U. S. 448 (1976); *New York Times Co.* v. *Sullivan,* 376

---

[2] Appellants Wyman-Gordon Co. and Digital Equipment Corp. are incorporated in Massachusetts. The Gillette Co. is incorporated in Delaware, but does business in Massachusetts. It is absolutely clear that a State may impose the same restrictions upon foreign corporations doing business within its borders as it imposes upon its own corporations. *Northwestern Nat. Life Ins. Co.,* 203 U. S. 243, 254–255 (1906).

Appellants First National Bank of Boston and New England Merchants National Bank are organized under the laws of the United States. In providing for the chartering of national banks, Congress has not purported to empower them to take part in the political activities of the States in which they do business. Indeed, it has explicitly forbidden them to make any "contribution or expenditure in connection with any election to any political office." 2 U. S. C. § 441b (a) (1976 ed.). Thus, there is no occasion to consider whether Congress would have the power to require the States to permit national banks to participate in political affairs. Cf. *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819).

[3] The Court concedes, *ante,* at 781, that, for this reason, this statute poses no threat to the ordinary operations of corporations in the communications business.

U. S. 254 (1964).[4]  Until recently, it was not thought that any persons, natural or artificial, had any protected right to engage in commercial speech.  See *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U. S. 748, 761–770 (1976).  Although the Court has never explicitly recognized a corporation's right of commercial speech, such a right might be considered necessarily incidental to the business of a commercial corporation.

It cannot be so readily concluded that the right of political expression is equally necessary to carry out the functions of a corporation organized for commercial purposes.[5]  A State grants to a business corporation the blessings of potentially perpetual life and limited liability to enhance its efficiency as

[4] It does not necessarily follow that such a corporation would be entitled to all the rights of free expression enjoyed by natural persons.  Although a newspaper corporation must necessarily have the liberty to endorse a political candidate in its editorial columns, it need have no greater right than any other corporation to contribute money to that candidate's campaign.  Such a right is no more "incidental to its very existence" than it is to any other business corporation.

[5] However, where a State permits the organization of a corporation for explicitly political purposes, this Court has held that its rights of political expression, which are necessarily incidental to its purposes, are entitled to constitutional protection.  *NAACP* v. *Button*, 371 U. S. 415, 428–429 (1963).  The fact that the author of that opinion, my Brother BRENNAN, has joined my Brother WHITE's dissent in this case strengthens my conclusion that nothing in *Button* requires that similar protection be extended to ordinary business corporations.

It should not escape notice that the rule established in *Button* was only an alternative holding, since the Court also ruled that the National Association for the Advancement of Colored People had standing to assert the personal rights of its members.  *Ibid.*, citing *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 458–460 (1958).  The holding, which has never been repeated, was directly contrary to an earlier decision of this Court holding that another political corporation, the American Civil Liberties Union, did not enjoy freedom of speech and assembly.  *Hague* v. *CIO*, 307 U. S. 496, 514 (1939) (opinion of Roberts, J.); *id.*, at 527 (opinion of Stone, J.).

an economic entity. It might reasonably be concluded that those properties, so beneficial in the economic sphere, pose special dangers in the political sphere. Furthermore, it might be argued that liberties of political expression are not at all necessary to effectuate the purposes for which States permit commercial corporations to exist. So long as the Judicial Branches of the State and Federal Governments remain open to protect the corporation's interest in its property, it has no need, though it may have the desire, to petition the political branches for similar protection. Indeed, the States might reasonably fear that the corporation would use its economic power to obtain further benefits beyond those already bestowed.[6] I would think that any particular form of organi-

---

[6] My Brother WHITE raises substantially these same arguments in his dissent, *ante,* at 809–810. However, his heavy emphasis on the need to protect minority shareholders at least suggests that "[t]he governmental interest in regulating corporate political communications," *ante,* at 809, might not prove sufficiently weighty in the absence of such concerns. Because of my conclusion that the Fourteenth Amendment does not require a State to endow a business corporation with the power of political speech, I do not find it necessary to join his assessment of the interests of the Commonwealth supporting this legislation.

The question of whether such restrictions are politically desirable is exclusively for decision by the political branches of the Federal Government and by the States, and may not be reviewed here. My Brother WHITE, in his dissenting opinion, puts the legislative determination in its most appealing light when he says, *ibid.:*

"[T]he interest of Massachusetts and the many other States which have restricted corporate political activity . . . is not one of equalizing the resources of opposing candidates or opposing positions, but rather of preventing institutions which have been permitted to amass wealth as a result of special advantages extended by the State for certain economic purposes from using that wealth to acquire an unfair advantage in the political process . . . ."

As I indicate in the text, *supra,* I agree that this is a rational basis for sustaining the legislation here in question. But I cannot agree with my Brother WHITE's intimation that this is *in fact* the reason that the Massachusetts General Court enacted this legislation. If inquiry into legislative

zation upon which the State confers special privileges or immunities different from those of natural persons would be subject to like regulation, whether the organization is a labor union, a partnership, a trade association, or a corporation.

One need not adopt such a restrictive view of the political liberties of business corporations to affirm the judgment of the Supreme Judicial Court in this case. That court reasoned that this Court's decisions entitling the property of a corporation to constitutional protection should be construed as recognizing the liberty of a corporation to express itself on political matters concerning that property. Thus, the Court construed the statute in question not to forbid political expres-

---

motives were to determine the outcome of cases such as this, I think a very persuasive argument could be made that the General Court, desiring to impose a personal income tax but more than once defeated in that desire by the combination of the Commonwealth's referendum provision and corporate expenditures in opposition to such a tax, simply decided to muzzle corporations on this sort of issue so that it could succeed in its desire.

If one believes, as my Brother WHITE apparently does, see *ante,* at 806, that a function of the First Amendment is to protect the interchange of ideas, he cannot readily subscribe to the idea that, if the desire to muzzle corporations played a part in the enactment of this legislation, the General Court was simply engaged in deciding *which* First Amendment values to promote. Thomas Jefferson in his First Inaugural Address made the now familiar observation:

"If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it." J. Richardson, A Compilation of the Messages and Papers of the Presidents 310 (1897).

One may entertain a healthy skepticism as to whether the General Court left reason free to combat error by their legislation; and it most assuredly did not leave undisturbed corporations which opposed its proposed personal income tax as "monuments of the safety with which error of opinion may be tolerated." But I think the Supreme Judicial Court was correct in concluding that, whatever may have been the motive of the General Court, the law thus challenged did not violate the United States Constitution.

sion by a corporation "when a general political issue materially affects a corporation's business, property or assets." 371 Mass. 773, 785, 359 N. E. 2d 1262, 1270 (1977).

I can see no basis for concluding that the liberty of a corporation to engage in political activity with regard to matters having no material effect on its business is necessarily incidental to the purposes for which the Commonwealth permitted these corporations to be organized or admitted within its boundaries. Nor can I disagree with the Supreme Judicial Court's factual finding that no such effect has been shown by these appellants. Because the statute as construed provides at least as much protection as the Fourteenth Amendment requires, I believe it is constitutionally valid.

It is true, as the Court points out, *ante,* at 781–783, that recent decisions of this Court have emphasized the interest of the public in receiving the information offered by the speaker seeking protection. The free flow of information is in no way diminished by the Commonwealth's decision to permit the operation of business corporations with limited rights of political expression. All natural persons, who owe their existence to a higher sovereign than the Commonwealth, remain as free as before to engage in political activity. Cf. *Maher* v. *Roe,* 432 U. S. 464, 474 (1977).

I would affirm the judgment of the Supreme Judicial Court.